## Andrews *v.* Long, Appellant.

Argued March 16, 1967. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*William Sloan Webber*, for appellant.

*Peter H. Block*, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 18, 1967:
George P. Andrews, who was driving east on Hamilton Avenue in Duquesne, observed, when about 15 feet from the intersecting North 2nd Street, that a truck approaching from his left was then some 80 feet away. The light for Hamilton Avenue traffic was green, for North 2nd Street red. The truck driver ignored the red light and entered into Hamilton Street, striking the Andrews car, inflicting injuries to Andrews. Andrews brought suit and recovered a verdict of $30,000.

The defendant has appealed, contending that he is entitled to judgment n.o.v. on the basis that Andrews was guilty of contributory negligence as a matter of law. He argues this on the proposition that, although Andrews moved on a green light, he was nevertheless negligent in not keeping his eyes on the approaching truck. While it is true a motorist may not abandon all caution and stifle the phenomena of his senses under the protective beam of a green traffic light, he still is not required to do what is unreasonable.

Andrews could not see up North 2nd Street until he was within 15 feet of the intersection because a building obtruded at the corner. When the plaintiff came abreast of the building and it no longer obstructed his vision he saw the defendant's truck some 80 feet distant and supposedly blocked by a red light. There was

nothing to tell him that the truck driver would defy the traffic warning, ignore the law of the road, and proceed headlong into obvious danger. The defendant says the plaintiff should have watched the truck, but the plaintiff could not, with safety to himself, keep his eyes glued to the truck. He was entering an intersection, he was proceeding downgrade where an acceleration could develop without his contributing to it, he had two other directions in which to look to parry potential collision.

This Court said in *Rasmussen v. Dresnin*, 382 Pa. 51: "A motorist entering an intersection under the protection of a green light, having once taken a comprehensive glance which reasonably assures him that no incipient situation can endanger his immediate forward movement, is not required to estimate with the accuracy of a speed calculator and stop watch what the other automobilist at present out of the intersection may possibly do. To impose stoppage or sluggish retardation of a car invited by the law to keep moving is to introduce an obstacle to expeditious travel which in itself may be as conducive to accident as excessive speed."

Andrews did take that "comprehensive glance" and noted a vehicle sufficiently far away that it cannot be said as a matter of law he was guilty of contributory negligence for not stopping, predicated on the proposition that he was compelled to assume the possibility that the truck driver would ignore the law which, through the medium of the traffic beacon, ordered him (the truck driver) to stop. Legal contributory negligence cannot be proclaimed unless the situation is such that reasonably minded men cannot differ as to its application. That was not the state of affairs present at the scene of the accident involved here. *Virden v. Hosler*, 387 Pa. 1; *Kunkle v. Continental Transportation Lines*, 372 Pa. 133.)

The defendant cites in support of his proposition the case of *Perpetua v. Philadelphia Transportation Co.,* 380 Pa. 561, but the decision in that case was practically nullified in *Koehler v. Schwartz,* 382 Pa. 352, 355, where we said: "Before entering the intersection the plaintiff here looked to the left and then to the right. No traffic was approaching from either direction and the intersection was clear of traffic. When he looked to the left he could see 150 feet. He could not then anticipate when he was directing his attention to the other approaches to the intersection that the defendant would come up and in defiance of a red light head into the intersection. The law recognizes the extent and limitations of a normal man's vision. He cannot simultaneously look in four different directions. Having exercised the care of a reasonably prudent person he cannot be held accountable for the actions of a motorist who deliberately flouts the warning of a red light and drives ahead in utter disregard of the rights of others lawfully and properly within an intersection."

Whether the plaintiff was guilty of contributory negligence was a question of fact for the jury, and we see nothing in the record which would justify a judgment n.o.v.*

---

* The defendant's counsel argues in his brief that even though the plaintiff had the right of way, he should not have proceeded. Counsel then says: "The situation is best expressed by an old epitaph, author unknown, reading as follows:

'Here lies the body of Boob McVay
Who died defending his right-of-way.
He was dead right, and going strong
But he's just as dead as though he were wrong.' "

This opinion writer replies, but only for himself and not for the Court, namely:

Here ends the case of Gabby McDay
Who entered a street 'gainst the right of way.
He hit a car which was where it belonged,
He wants a verdict, but he's just dead wrong.

The defendant argues for a new trial on the basis that the verdict was excessive. The plaintiff sustained a permanent injury to his back, and a concussion of the brain which has resulted in persistent headaches and nervous anxiety. The plaintiff had had trouble with his back prior to the accident but his medical expert testified that the accident aggravated that condition and caused a degeneration of the intervertebral discs.

The plaintiff's doctor testified that because of the accident the plaintiff suffered what is called a "post-traumatic anxiety state," that he had concussional symptoms which resulted in persistent headaches, nervousness and restlessness; that he had a "tightening and spasticity of the muscles" and that he suffered from a "degenerative disc pathology between the 6th and 7th vertebrae." The doctor said that even four years after the accident the plaintiff "had residuals of a cerebral concussion."

The plaintiff testified that he was in the business of creating and selling advertising and that because of his disablement he could not produce ideas in his work and as a result lost substantial sums of money. As to this the plaintiff's doctor testified: "Yes, this is a consistent finding, and it is understandable and actually a very common situation in these head injuries. The unusual thing is the persistence of the symptoms—restlessness, anxiety, tension, headaches, nervousness, fatigability, all of which are a source of keeping a man from performing his normal activity."

In arguing the minutiae of the evidence, the defendant states in his brief that the plaintiff said he had to rest in bed 11 to 12 hours a day and then "It developed on further cross-examination that appellee was not really resting but instead during this so-called 'rest period' was answering telephone calls, dictating correspondence, reading mail and giving directions and

instructions to his employees." It is not clear that these two "rest periods" were contemporaneously co-existent. The plaintiff testified that from 1961 to 1962 he "had to spend eleven and twelve hours a day in bed." Later he testified as to what he did in the *office*. "Q. My question was did you tell Doctor Sherman when you told him that there were hours at a time that you couldn't work—A. Yes. Q. Did you tell him that during these rest hours you were answering the telephone? A. No, I didn't. Q. And that you were dictating letters? A. No. Q. You didn't tell him that? A. No. Q. Well, did you tell Doctor Sherman that there were hours during the business day when you rested and couldn't work? Did you tell Dr. Sherman that? A. That's right. Q. And actually as a matter of fact, during those periods you were answering business telephone calls? A. On occasion. Q. Yes, when calls would come in you'd answer? A. No, I had others answer it, and I had that door locked. Q. I mean when somebody called and they would refer it to you. A. They would take the call, and I would call back after several hours."

The plaintiff indicated that prior to the accident he had never suffered a headache, but that, following the accident, headaches were persistent. Defendant's counsel in his brief treats this contention ironically: "He insisted on the correctness of his answer even though admitting that his first marriage had terminated in a divorce after a separation of many years and in spite of the fact that he had operated his own business for about 25 years."

But there is a difference between a physical headache and an intellectual or emotional headache. One is the result of a shaken body, the other is the result of a shaken career. A physical headache results from a blow on the head or a malfunction of the internal machinery, an intellectual headache results from a

blow at the pocketbook, one's prestige, one's esteem or a disappointment in emotional or idealistic expectations.

The plaintiff testified that after the accident he was too sick to work full time. The defendant argues this cannot be believed because "the testimony shows that he obtained a divorce and was remarried on successive days in 1963 and became the father of a child." It is not clear how an inability to work would render impossible the phenomena recounted.

The plaintiff's life expectancy was stipulated to be 20 years. On the basis of established loss of earning power, as well as pain and suffering extending over many years, it cannot be said that $30,000 is an excessive verdict.

Judgment affirmed.

Mr. Justice JONES, Mr. Justice COHEN and Mr. Justice ROBERTS concur in the result.